# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. *15Cr10327* |
| ) | |
| v. ) | VIOLATION: |
| ) | 18 U.S.C. § 1347 - Health Care Fraud |
| ) | |
| WARNER CHILCOTT SALES ) | 18 U.S.C. § 982(a)(7) – Criminal |
| (U.S.) L.L.C. ) | Forfeiture |

## INFORMATION

The United States Attorney charges that:

### THE DEFENDANT

1.      Defendant **WARNER CHILCOTT SALES (U.S.) LLC ("WARNER CHILCOTT")** was a limited liability company organized under the laws of Delaware. **WARNER CHILCOTT**'s U.S. operations were headquartered in Rockaway, New Jersey. **WARNER CHILCOTT** distributed and sold in interstate commerce pharmaceutical drugs intended for human use, including for sale and use in Massachusetts.

2.      At certain times from October 2009 through February 2012, **WARNER CHILCOTT** sold in interstate commerce a number of drugs, including, without limitation, Actonel (used to prevent and treat postmenopausal osteoporosis), Atelvia (used to treat postmenopausal osteoporosis), Doryx (used to treat acne), Enablex (used to treat overactive bladder), Loestrin 24 FE (an oral contraceptive), and various formulations of these products.

1

## THE MEDICARE PROGRAM

3.     In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care for persons aged 65 and older, and for persons with disabilities. The funds set aside by Congress to pay for the necessary medical care of these older or disabled Americans, and any premiums paid by such persons, were referred to as the Medicare Program Trust Funds.

4.     The Centers for Medicare & Medicaid Services ("CMS") was a federal agency within the U.S. Department of Health and Human Services ("HHS") that was responsible for the funding, administration and supervision of the Medicare Program.

5.     Pursuant to sections 1860D-1–1860D-43 of the Social Security Act, 42 U.S.C. §§ 1395w-101-154, Congress established "Part D" of the Medicare program. Medicare Part D provided for the coverage of certain prescription drugs.

6.     The law prohibited, among other things, the offer or payment of remuneration to physicians or their staff to induce the sale of items or services for which payment would be made, in whole or in part, under the Medicare Program, conduct often referred to as "kickbacks" or "bribes."

## THE MANAGED CARE LANDSCAPE

7.     Insurance companies, including insurance companies administering the Medicare Part D program, that provided medical insurance coverage ("plans"), typically identified the drugs that they paid for on behalf of their members ("covered" drugs) in a list called a formulary. The plans typically allocated covered drugs into several specified tiers within the formulary. Tier 1 typically contained less expensive generic drugs. Tier 2 typically included "preferred" brand-

name drugs, while Tier 3 typically included "non-preferred" brand-name drugs. Tier 4, offered by some plans, was typically reserved for more expensive specialty drugs. With each ascending tier, the insurance plan typically covered less, and the individual member paid more, for the cost of the drug.

8.      Pharmaceutical companies often negotiated contracts with insurance companies to secure favorable formulary positions. In these contracts, pharmaceutical companies frequently agreed to subsidize the cost of their products, through discounts and rebates, in return for inclusion on, or a preferred tier within, a plan's formulary.

9.      Plans applied additional measures to manage prescription drug costs. For instance, some plans only paid for a drug after the member had tried a less expensive drug and the drug did not work.

10.      Another cost-management tool employed by many plans was a prior authorization requirement ("PA"). As **WARNER CHILCOTT** knew and understood, many plans, including certain Medicare Part D plans, did not cover a drug that was not covered on the formulary unless a physician prepared a PA explaining why such a drug was medically necessary for a particular individual. Typically, the physician was required to describe the patient's medical condition and explain why, based on the physician's medical judgment and the patient's specific condition, the requested drug was necessary for the patient.

11.      Insurance companies expected that PAs were prepared by the physician and staff, without interference from pharmaceutical companies. As **WARNER CHILCOTT** knew and understood, a pharmaceutical sales representative was not permitted to be involved with any aspect of the submission of a PA unless the patient consented. The Health Insurance Portability

3

and Accountability Act of 1996 ("HIPAA"), Public Law 104-191; 45 C.F.R. 160.101, *et seq.*, prohibits a pharmaceutical sales representative from having access to a patient's individually identifiable health information, including information contained in a PA, without the patient's consent.

## THE PROCTER & GAMBLE ACQUISITION

12.    Prior to October 2009, **WARNER CHILCOTT** primarily sold drugs related to women's health care (such as oral contraceptives) and dermatology. In or about October 2009, **WARNER CHILCOTT's** indirect parent corporation, Warner Chilcott plc, acquired the pharmaceutical business of the Procter & Gamble Company ("P&G"), which owned Actonel, Enablex, the rights to develop Atelvia, a successor drug to Actonel, among other drugs.

## COUNT 1
## 18 U.S.C. §1347 (Health Care Fraud)

13.    The allegations in paragraphs 1 through 12 are herein re-alleged and incorporated in full.

14.    From in or about October 2009 to in or about September 2013, in the District of Massachusetts and elsewhere, the defendant

## WARNER CHILCOTT

did knowingly and willfully execute a scheme and artifice to defraud Medicare, a health care benefit program as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the

4

delivery of and payment for health care benefits, items and services, in violation of Title 18, United States Code, Sections 1347 and 2, as set forth below.

## THE WARNER CHILCOTT CULTURE

15. **WARNER CHILCOTT** often hired sales representatives who lacked prior experience in the pharmaceutical industry. Instead, they often hired young, assertive individuals with sales experience from, for instance, rental car and uniform companies. Certain company executives and managers frequently stated that they preferred hiring "Type A, crazy" sales representatives who could sell "the Warner Chilcott way," and during interviews they administered a personality test designed to highlight candidates who were aggressive and not sensitive to rules.

16. Company executives and managers instructed the sales force to sell its products primarily by taking physicians and staff out for free dinners and by retaining high-prescribing physicians as paid "speakers" for the company, and then leveraging these meals and payments into prescriptions for **WARNER CHILCOTT** drugs, as described below.

17. Company executives and managers discouraged sales representatives from using scientific studies or literature describing the clinical advantages of the products during interactions with physicians. The Company did not employ medical science liaisons who were available to answer clinical questions from sales representatives and physicians. On multiple occasions, the Company president publicly belittled and ridiculed sales representatives and/or managers who raised questions about clinical and/or regulatory issues.

18. The company "force ranked" the sales representatives against each other in reports distributed regularly to the relevant sales force. Sales representatives were told that the

5

lowest performers—generally sales representatives in the bottom third—would be terminated. Moreover, company executives and managers often derided underperforming sales representatives, who were often the legacy P&G employees, as "creampuffs."

19.     Until early 2012, most sales representatives received minimal training on health care laws and rules, and the company had limited compliance resources prior to learning that the United States was investigating its conduct.

## THE "MED ED" AND "SPEAKER" PROGRAMS

20.     **WARNER CHILCOTT**'s primary business tactic was for sales representatives to take physicians out for free dinners. **WARNER CHILCOTT** referred to these dinners as medical education programs or "med eds." In fact, at many med eds, little, if any, medical information was imparted, and these med eds frequently consisted of nothing more than a sales representative taking physicians out to an expensive restaurant.

21.     The Pharmaceutical Research and Manufacturers of America ("PhRMA") was a trade group formed in 1958 to represent U.S. biopharmaceutical research companies. PhRMA established a Code on Interactions with Health Care Professionals ("PhRMA Code"), which is guided by the principle that interactions between pharmaceutical company representatives and health care providers "should be focused on informing healthcare professionals about products, providing scientific and educational information, and supporting medical education." The PhRMA Code provided that pharmaceutical representatives may provide "occasional" meals to health care providers if the meals were accompanied by presentations that "provide scientific or educational value and the meals (a) are modest as judged by local standards; (b) are not part of an entertainment or recreational event; and (c) are provided in a manner conducive to

6

informational communication." Moreover, the PhRMA Code provided that meals offered in connection with informational presentations made by field sales representatives or their immediate managers should also be "limited to in-office or in-hospital settings."

22.     Executives and senior management frequently bragged that the company did not join PhRMA and did not subscribe to the PhRMA Code. The president, sales directors, and managers also informed sales representatives that, by not joining PhRMA, **WARNER CHILCOTT** had a competitive advantage over its peers and could do things that others could not—such as take physicians out for free dinners.

23.     Free of PhRMA Code restraints, executives and managers regularly stressed the importance of med eds as the lifeblood of a successful **WARNER CHILCOTT** sales representative. During employment interviews, potential sales representatives were asked if they would be able to go out to dinner with physicians several times each week. Once hired, sales representatives were often told that they had to take physicians out to dinner at least twice a week, and the most successful sales representatives conducted four or more med eds each week. Executives and managers closely tracked med ed activity and frequently informed the sales force that the sales representatives generating the most business were organizing the most med eds.

24.     **WARNER CHILCOTT** provided limited oversight of sales representatives' expense accounts, and sales representatives had access to virtually unlimited expense accounts for med eds. The dinners were frequently held at expensive restaurants. The company nominally capped meals at $125 per attendee. When this budget was exceeded, some managers instructed the sales representatives to falsely report that additional people attended the dinner, to avoid detection. Similarly, when sales representatives exceeded the monthly limit on their corporate

credit card, some managers simply increased the limit. By and large, **WARNER CHILCOTT** sales representatives who spent the most money on med eds achieved the highest bonuses and received the most promotions.

25.     Company executives and managers instructed sales representatives to invite to dinner physicians with the highest prescription volume in their drug class. Frequently, physicians initially resisted the dinner invitations, because they were reluctant to attend what they believed would be a boring, didactic presentation, and/or because they did not want to spend time away from their spouses after work. When this occurred, sales representatives frequently reassured physicians that **WARNER CHILCOTT** dinners did not include an extensive scientific presentation or PowerPoint slide deck, but simply consisted of a dinner. Physicians were also frequently told that they could bring their spouse to dinner, and many did, which reinforced the social nature of the event.

26.     At **WARNER CHILCOTT** med eds, physicians often ordered the most expensive items on the menu along with expensive wine. Some physicians ordered extra meals and/or bottles of wine to bring home, and others ordered a restaurant gift card to bring home with them. Some sales representatives paid for their highest-prescribing physicians to go out to dinner on their own.

27.     In addition, some sales representatives also gave physicians gift cards to restaurants and other stores. Many sales representatives paid for office holiday parties as well as parties at clubs and on yachts.

28.     **WARNER CHILCOTT** med eds were frequently devoid of clinical content. Often, there was only a token reference to the drug. Other times, the attendees would simply

8

raise their glasses to "toast" **WARNER CHILCOTT**. Not infrequently, the product was not mentioned at all.

29.     Many **WARNER CHILCOTT** managers instructed sales representatives that they expected the physicians who attended the free dinners to prescribe more of their drugs. As one successful manager instructed his district, "We've done many Med Eds, lunches, coffee breaks with our top physicians, and now is a time that accountability comes in." Certain managers tracked the "return on investment" that the company achieved from the med eds, including those with little or no product education.

30.     A core **WARNER CHILCOTT** sales tactic to ensure a high return on investment was to have "business conversations" with physicians who attended med eds. A "business conversation" was an attempt to pressure a physician to prescribe a drug. For instance, at the close of the meal, or in a follow-up visit, the sales representative would reference the free dinner and ask for business. The sales representative would then track the physician's prescribing habits. If the physician did not prescribe the drug at a sufficient level, the sales representative would "hold the doctor accountable" on a subsequent visit by reminding the physician of his or her commitment, showing the physician his or her prescribing history, and demanding that the physician honor his or her commitment. In the med ed context, a sales representative would frequently warn, explicitly or implicitly, that the free dinners would cease if the physician did not start prescribing more of the **WARNER CHILCOTT** drug.

31.     Another **WARNER CHILCOTT** tactic was to pay "speaker" fees to top-prescribing physicians, who were often referred to as "advocates." **WARNER CHILCOTT** instructed managers and sales representatives to cultivate the highest-prescribing physicians in

9

the applicable drug class as "speakers" for the company. "Speakers" were usually selected based on either their volume of **WARNER CHILCOTT** prescriptions or their volume of overall prescriptions in the applicable drug class—and thus their potential for being a large **WARNER CHILCOTT** prescriber—rather than their clinical knowledge, expertise, or reputation in the field.

32.    Upper management closely tracked how frequently "speakers" were prescribing **WARNER CHILCOTT** products and determined that a high percentage of the company's prescriptions came from speakers. Thus, sales representatives were pushed to retain multiple "speakers," as the company believed that there was a direct correlation between prescriptions and the number of speaker events held in a territory.

33.    The vast majority of "speaker" events were "roundtables." These events often amounted to dinners at nice restaurants, indistinguishable from med eds, except that one of the physicians, the "speaker," was also paid. The payments ranged from $500 to $1,200 per event. At the roundtables, the "speaker" rarely used PowerPoint slides or gave a lengthy clinical presentation. Rather, the event was largely social in nature.

34.    In some instances, the "speaker" was paid even though no other physician was present during the event. For instance, in one district, where the manager encouraged his sales representatives to sign up "speakers" so they would be "addicted to the crack," sales representatives frequently paid physicians for simply spending a few minutes with them in their offices. Some physicians were paid for doing nothing more than going out to dinner with the sales representative, for going out with the physician's spouse or friends, for attending an office

10

holiday party, or for hosting a personal social event, without even the pretense of a clinical presentation or an audience.

35.     Once a physician became a "speaker," **WARNER CHILCOTT** expected the physician to frequently prescribe the Company's drugs. Numerous managers instructed sales representatives to ensure that their "advocates" were prescribing at a sufficient level. At one point, the director of the Osteoporosis Division imposed a market share requirement with respect to Atelvia "speakers," requiring that these physicians prescribe Atelvia a certain percentage of the time.

36.     If a "speaker" did not prescribe at a sufficient level, upper management instructed sales representatives to stop using—paying—the physician. Sales representatives were expected to tell "speakers" falling short of expectations that, if their **WARNER CHILCOTT** prescriptions did not increase, they would no longer be used as a "speaker." In one district, during a "plan of action" meeting, a manager handed out a "speak/no speak" list, identifying physicians who had met the market share requirement, and thus could be used for speaking events, and those who did not, who could not be used. If a "speaking" event had already been scheduled with a physician on the "no speak" list, the event had to be canceled.

## THE PRIOR AUTHORIZATION SCHEME

37.     Company executives frequently stated that they preferred to not negotiate rebates and discounts with insurance companies. Company executives frequently informed the sales force that physician concerns about cost and drug coverage were merely a "smokescreen" that the representatives had to overcome.

11

## Manipulation of Prior Authorizations for Actonel

38.    In 2010, certain insurance plans in New York City and Long Island removed Actonel from their formularies in favor of Fosamax, which had been available in generic form since 2009. Many doctors were reluctant to prescribe a drug for a patient that was not covered by an insurance plan. The Warner Chilcott district manager for this New York City/Long Island district knew and understood that these insurance plans would not pay for Actonel unless a physician submitted a PA requesting the drug for a particular patient. Moreover, the district manager knew and understood that a typical busy physician viewed the preparation of a PA for Actonel as burdensome—especially when a more inexpensive generic drug was available.

39.    Therefore, the New York district manager directed certain sales representatives he supervised to fill out PAs for Actonel and ensure that the PAs were submitted to insurance plans. The district manager shared with his sales representatives clinical justifications that he believed would result in an insurance plan approving the PA.

40.    At the district manager's direction, certain of his sales representatives filled out numerous Actonel PAs, often using the clinical justifications provided by the district manager. In many cases, the clinical reasons were false or of uncertain application to the particular patient and were used simply to gain approval of the PA.

## Manipulation of Prior Authorizations for Atelvia

41.    Atelvia is a bisphosphonate indicated for the treatment of postmenopausal osteoporosis. Atelvia contains risedronate, the same active ingredient found in Actonel, a legacy P&G drug.

42.    The Food and Drug Administration ("FDA") approved Atelvia in October 2010.

43.    In January 2011, executives brought Atelvia to market without, by and large, negotiating favorable formulary coverage with insurance companies.

44.    When Atelvia was launched, most insurance companies covered generic Fosamax at Tier 1 in their formularies. Insurance coverage for Atelvia was poor. Many plans did not cover Atelvia at all, and others only covered the drug in Tier 3. If a plan covered generic Fosamax at Tier 1 and did not cover Atelvia at all, generic Fosamax cost patients only a few dollars, while Atelvia could cost patients as much as $140 per pill.

45.    Prior to Atelvia's launch, executives were warned by company employees that Atelvia's insurance coverage would be poor. Rather than negotiate contracts and rebates with insurance companies, the company instead chose to sell Atelvia by having the sales representatives push through PAs for the drug. Company executives believed that, through this strategy, the company would generate demand and place pressure on plans to place Atelvia on a more favorable tier in their formularies. This way, the company could achieve favorable coverage without having to pay rebates.

46.    The president informed the sales force that they had to develop a "core competency" with respect to PAs, and that PAs were "part of the job." Directors and managers trained the osteoporosis sales force on the PA process.

47.    Company executives and managers also asked successful sales representatives and managed care employees which medical justifications were resulting in approved PAs around the country. For instance, PAs that included language such as "patient has failed on Fosamax" or "patient has GERD [gastro-esophageal reflux disease]" often led to an approved PA. Upper management shared this information with the sales force and instructed them to use

13

these "canned" justifications on PAs, whether or not they were true for a particular patient. Many sales representatives coached physicians and their staff on PAs, providing the magic language that would result in a successful prescription.

48.     In many offices, physicians delegated PAs for Atelvia to a nurse, physician's assistant, or office manager. Many of these offices were extremely busy, and company sales representatives learned that, for them, preparing a PA was a relatively low priority. Upper management instructed sales representatives to determine which individual in the physician's office handled PAs and to take that person out for free "med ed" or "speaker" dinners, as well as provide him or her with free lunch, snacks, coffee and treats. The company hoped that these free meals or "speaker" payments would increase the likelihood that the nurse or medical assistant would prepare a PA for Atelvia.

49.     In addition, dozens of sales representatives around the country filled out Atelvia PAs themselves for submission to insurance companies. These sales representatives often included the canned medical justifications that had been provided to them by upper management, having no idea if the justification was applicable to the patient.

50.     At various times, sales representatives (a) completed PAs in physicians' offices; (b) took patient files from physicians' offices and prepared PAs at home; (c) called insurance companies, falsely claiming that they were an employee in the physician's office, to request that Atelvia be covered; and (d) forged physicians' signatures on PAs.

51.     Several sales representatives submitted PAs through an on-line drug prior authorization provider that allows prescribers to complete the PA process electronically. Several sales representatives registered for and used this online provider, falsely claiming that they were

physicians or employees of a physician. These sales representatives then prepared and often submitted Atelvia PAs through the online provider under the name of the physician, without the consent or authorization of the patient or physician, often using medical justifications without knowing if they applied to the patient.

52.     Certain members of senior management were aware that sales representatives were filling out PAs, because "success stories" concerning PAs (and other topics) were often communicated by voicemail and forwarded around the company. For instance, in a voicemail sent to the entire osteoporosis sales force as a "success story," one highly-successful sales representative explained that he had "been doing lots of prior authorizations" using canned justifications such as "compliance and upper GI issues," bragging that out of "25 prior authorizations I have done in these two days, almost like 18, 19 have gone through."

53.     The most successful sales representatives were those who were filling out Atelvia PAs. Some of these sales representatives spent entire days filling out PAs, rather than calling on physicians. Managers and directors reported to executives which sales representatives were having the most success with PAs, and these representatives were widely praised for their efforts. Moreover, some of the most successful district managers explicitly instructed and authorized their sales representatives to fill out PAs.

54.     On or about February 9, 2011, a New York-based insurance company informed the company that it had identified several Atelvia PAs submitted by different physicians that were suspiciously similar. The insurance company employee stated in an email:

> I have reviewed the documents being submitted and it is apparent
> that these are being mass produced as the rational[e] is the same on
> all. The funny part is that the physician's signatures are all the
> same handwriting although they are different physicians.

15

Additionally, we called the members regarding the intolerance to other agents in the class and the members never have had an issue with the side effects nor have they ever requested a change which leads me to believe that this is a manufacture driven initiative to drive market share of Atelvia. I hope you are aware this is illegal and if it is not ceased immediately I will be forced to report to the S[t]ate Department of Insurance, Medicare and the FDA.

55.     This issue was brought to the attention of executives, including the president. The misconduct at issue occurred within the highest revenue district within the Osteoporosis Division. But the company did not discipline either the sales representative who falsified the PAs or the district manager who was aware of the conduct.

56.     Subsequent to this incident, on February 11, 2011, the company distributed a memorandum to its sales force concerning PAs (the "February 2011 memo"). The memorandum stated, among other things, that a sales representative cannot "be involved with any aspect of the completion or submission of a Coverage Determination and/or Prior Authorization request, nor should you see any patient information, pursuant to HIPAA."

57.     Some managers did not disseminate the February 2011 memo to their sales representatives. Directors and managers continued to exhort sales representatives to make sure that Atelvia PAs were completed, and numerous sales representatives continued to fill out PAs long after the memorandum was issued.

58.     Throughout 2011, the company received numerous warnings that sales representatives were still filling out Atelvia PAs. Some sales representatives and district managers complained to upper management about the practices. For example, a Pennsylvania-based sales representative complained to her manager, the director of medical affairs, and in-

16

house counsel that, among other issues, her manager had instructed his team to fill out PAs, which she considered to be illegal. The manager was not disciplined, and, after the manager threatened to fire the sales representative, she resigned.

59.     The company promoted and transferred to the Women's Healthcare sales division, the most prestigious division at the company, some of the most successful managers in the Osteoporosis Division, who had instructed their sales representatives to fill out Atelvia PAs. Executives promoted these managers because of their acumen with respect to PAs, since other company products, such as Lo Loestrin, were beginning to face insurance coverage challenges as well. Executives recognized, in a 2012 business plan, that "our most successful [Atelvia] districts focused heavily on getting to doctors willing to do PAs and heavily supporting them so that the PAs were pursued."

## FALSE SUPERIORITY CLAIMS FOR ACTONEL

60.     In or around 2010, sales for bisphosphonates were falling because of negative media reports concerning potential adverse effects of taking these drugs. In the midst of this downturn, in late 2010, **WARNER CHILCOTT** was preparing to launch Atelvia, which, like Actonel, contained risedronate.

61.     In approximately May 2010, the **WARNER CHILCOTT** chief executive officer ("CEO") formulated a new marketing message for Actonel. The CEO instructed the sales force to begin telling physicians that Actonel was superior to other bisphosphonates due to its "mechanism of action" ("MOA"). Sales representatives were instructed to tell physicians that Actonel was superior because it penetrated more deeply into the bone, and exited the bone more quickly, qualities thought to be beneficial to treat osteoporosis. One director told the managers

17

and sales representatives in his region that the reason why Actonel was approved by the FDA to treat so many conditions was because of its superior mechanism of action. There was no clinical evidence to support this claim.

62.     This "MOA story" was derived from a 2007 retrospective survey funded by **WARNER CHILCOTT's** predecessor, P&G. The survey itself was inconclusive, stating that Actonel's structure "may" allow the drug to penetrate deeply into the cortical region of the bone, which "might be clinically relevant," although "additional work will need to be done to confirm these hypotheses." **WARNER CHILCOTT** never undertook a clinical study to support the hypothesis. Indeed, no head-to-head study exists demonstrating Actonel's superiority over any other bisphosphonate.

63.     Nevertheless, **WARNER CHILCOTT** directed the sales force to deliver the MOA message to physicians. The new message was introduced at "Plan of Action" meetings with PowerPoint presentations, including one entitled "Why Actonel is Different and Superior to Fosamax and Boniva." Sales representatives were also encouraged to support the MOA story with a visual demonstration in which they poured syrup, representing Fosamax, on one sponge, which represented bone, and water, representing Actonel, on a second sponge. The point of the demonstration was to show that, because of its MOA, Actonel quickly and deeply penetrated and exited bone, like water, whereas Fosamax coated the bone, like syrup. There was no clinical evidence to support this demonstration.

64.     In at least one instance, a sales representative objected to delivering this message, because it lacked clinical support. This sales representative complained to his manager and in-house counsel. He was promptly terminated.

\* \* \* \* \*

65.     In October 2013, **WARNER CHILCOTT** was acquired by another pharmaceutical company. According to public filings, the **WARNER CHILCOTT** CEO received tens of millions of dollars of compensation in connection with the acquisition.

All in violation of 18 U.S.C. § 1347.

## FORFEITURE ALLEGATIONS
## (18 U.S.C. § 982)

The United States Attorney further charges that:

66.     The allegations set forth in paragraphs 1 through 65 are herein incorporated in full.

67.     Upon conviction of the offense alleged in Count One of this Information, the defendant,

### WARNER CHILCOTT SALES (U.S.) LLC,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses. Such property includes, without limitation, the following:

     a.    a sum of money equal to $2,000,000 in United States currency, representing the amount of gross proceeds traceable to the offenses.

68.     If any of the property described in paragraph 67 above, as a result of any act or omission of the defendant –

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred or sold to, or deposited with, a third party;

     c.    has been placed beyond the jurisdiction of this Court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b)(1), incorporating 21 U.S.C.

§ 853(p), to seek forfeiture of any other property of the defendant up to the value of the property

described in paragraph 67 above.

    All pursuant to Title 18, United States Code, Section 982(a)(7).


CARMEN M. ORTIZ
United States Attorney

By:

DAVID S. SCHUMACHER
MIRANDA HOOKER
SONYA RAO
SUSAN M. POSWISTILO
Assistant U.S. Attorneys

JILL P. FURMAN
Deputy Director
Consumer Protection  Branch
U.S. Department of Justice

Dated: October 29, 2015